IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

|  |  |  |
|---|---|---|
| TAMMY CAMPBELL, Plaintiff, | ) ) ) ) | |
| v. | ) | CIVIL NO. 3:12-CV-623(JAG) |
| CAROLYN W. COLVIN, Commissioner of Social Security, Defendant. | ) ) ) ) ) | |

## REPORT AND RECOMMENDATION

Tammy Campbell ("Plaintiff") is 46 years old and worked as a systems engineer. On December 27, 2006, Plaintiff applied for Social Security Disability ("DIB") under the Social Security Act (the "Act") with an alleged onset date of December 6, 2006, claiming disability due to bipolar disorder. Plaintiff's claim was presented to an administrative law judge ("ALJ"), who denied Plaintiff's request for benefits. The Appeals Council subsequently remanded the case for a second hearing. The ALJ denied Plaintiff's claim again and the Appeals Council then denied Plaintiff's request for review.

Plaintiff now challenges the ALJ's denial of benefits, asserting that substantial evidence did not support the ALJ's decision to assign less than controlling weight to the treating physician's opinions. (Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl.'s Mem.") at 12.) Plaintiff further contends that, as a result, the ALJ erred in assessing Plaintiff's credibility regarding her symptoms. (Pl.'s Mem. at 12.)

This matter is before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment.[1] Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying DIB. The Commissioner's final decision is based on a finding by an ALJ that Plaintiff was not disabled as defined by the Act and applicable regulations.

For the reasons discussed herein, it is the Court's recommendation that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 9) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. MEDICAL HISTORY

### A. Education and Work Experience

Plaintiff received an undergraduate degree and a Master's degree in systems engineering. (R. at 37.) Plaintiff had a job delivering pizza, which she quit in 1996. (R. at 41.) She then worked as a systems engineer for the United States Navy for twenty years. (R. at 39-41.) Starting in 2000, Plaintiff worked in her job at the Navy part-time to reduce her stress levels because of her bipolar disorder. (R. at 62.) On December 6, 2006, the Navy pulled Plaintiff's security clearance and terminated her employment, because Plaintiff missed multiple days of work, had trouble keeping her bipolar disorder under control and experienced a fugue state the month before her termination. (R. at 39-41.)

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

B. Medical Records

   i.   Dr. Ronald Gaertner, M.D.

Plaintiff's treating psychiatrist, Dr. Ronald Gaertner, M.D., had been Plaintiff's

psychiatric doctor since February 1996. (R. at 510.) Dr. Gaertner's records begin on December

4, 2003, when he assessed that Plaintiff had increased anhedonia and mild mood liability. (R. at

351.) Plaintiff next saw Dr. Gaertner on April 6, 2004, when he noted Plaintiff's mood stability

and her significant environmental stressors with regard to a recent adoption. (R. at 350.) During

Plaintiff's June 22, 2004 appointment, Dr. Gaertner observed that Plaintiff demonstrated mild

mood instability and that her environmental stressors had lessened. (R. at 349.) Plaintiff

followed up with Dr. Gaertner on August 17, 2004, and Dr. Gaertner recorded that Plaintiff

demonstrated "pronounced improvement" in her mood stability. (R. at 348.) On Plaintiff's

October 19, 2004 visit, Dr. Gaertner assessed that Plaintiff exhibited mood stability and suffered

sleep disturbance, but Plaintiff experienced no manic excitation. (R. at 347.) During Plaintiff's

January 10, 2005 appointment, Dr. Gaertner indicated that Plaintiff displayed mood stability and

a mild sleep disturbance. (R. at 346.) Again on April 12, 2005, Dr. Gaertner assessed that

Plaintiff demonstrated mood stability and had no evidence of bipolar dynamics. (R. at 345.) On

June 22, 2005, Plaintiff showed affective stability with no evidence of depression, anhedonia or

mood liability. (R. at 344.) Dr. Gaertner discerned, on September 20, 2005, that Plaintiff had

mild affective blunting, anhedonia and agitation. (R. at 343.) He also observed that her mood

stability had improved overall. (R. at 343.)

Plaintiff next saw Dr. Gaertner on January 3, 2006, and he indicated that she was

"demonstrating mood stability, with no evidence of agitation, anxiety or bipolar dynamics." (R.

at 336.) On June 28, 2006, Dr. Gaertner recorded that Plaintiff was displaying continued

depression with limited improvement due to medication. (R. at 341.) On August 22, 2006, Plaintiff suffered with stressors associated with child care and Dr. Gaertner noted her overall mood stability. (R. at 340.) During Plaintiff's October 12, 2006 appointment, Plaintiff did not present any further evidence of pronounced anxiety or fugue states. (R. at 339.) On November 9, 2006, Dr. Gaertner adjusted Plaintiff's medication, because she was displaying continued fugue state and anxiety. (R. at 335.) Plaintiff underwent an initial assessment at Dr. Gaertner's office on November 15, 2006, during which Pam Faulkner, CANP, reported that Plaintiff had a bright affect, was neatly dressed, had good memory and impulse control, was talkative, exhibited an anxious mood, showed intact attention/concentration and suffered no suicidal/homicidal ideation. (R. at 337-38.)

On August 11, 2007, Dr. Gaertner completed a mental residual functional capacity assessment and opined that Plaintiff had no difficulty or slight difficulty in her abilities to: (1) remember locations and work-like procedures, (2) understand and remember short and simple repetitive instructions or tasks, (3) request assistance from supervisors, (4) accept instructions and respond appropriately to criticism from supervisors, (5) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, (6) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, (7) be aware of normal hazards and take necessary precautions, and (8) travel in unfamiliar settings and use public transportation. (R. at 500-01.) Dr. Gaertner assessed that Plaintiff had moderate difficulty with her abilities to: (1) understand and remember detailed instructions, (2) carry out short and simple repetitive instructions or tasks, (3) sustain ordinary routine without special supervision, (4) work in coordination with or proximity to others without being distracted, (5) make simple work-related decisions, (6) interact appropriately with the general public or customers, (7) respond

4

appropriately to expected or unexpected changes in the work setting, and (8) set realistic goals or make plans independently. (R. at 500-01.) Dr. Gaertner further opined that Plaintiff had moderately severe difficulty with her abilities to: (1) carry out detailed instructions which may or may not be repetitive, (2) maintain attention and concentration for at least two straight hours with at least four such sessions in a work day, (3) complete a normal work day and work week without interruptions from psychologically based symptoms, and (4) perform at a consistent pace without an unreasonable number and length of rests. (R. at 500-01.) Plaintiff suffered no severe difficulties. (R. at 500-01.)

On the same date, Dr. Gaertner completed a mental impairment questionnaire for Plaintiff, which indicated that Plaintiff visited Dr. Gaertner on a quarterly basis. (R. at 502-03.) He noted that Plaintiff's mental impairments caused mild restrictions on her activities of daily living, moderate difficulty in maintaining relationships and marked difficulty in maintaining concentration, persistence or pace with four or more episodes of decompensation. (R. at 502-03.) Dr. Gaertner recorded Plaintiff's highest GAF score of the past year and her current GAF score at that time at $65^2$ and her lowest GAF score in the past year at $40.^3$ (R. at 502.) He also opined that work-related stressors would increase her level of impairment, including production demands or quotas, demands for precision, attendance requirements and the need to make quick and/or accurate, independent decisions for problem-solving on a consistent basis. (R. at 500-01.)

---

2    A GAF of 65 falls within a range of "some mild symptoms," characterized by "depressed mood and mild insomnia" or "some difficulty in social, occupational, or school functioning," characterized by "occasional truancy or theft within the household," however "generally functioning pretty well" and having "some meaningful interpersonal relationships." DSM-IV-TR 34 (American Psychiatric Association 2000).

3    A GAF of 40 falls within a range of "some impairment in reality testing or communication," characterized by occasional "illogical, obscure or irrelevant" speech or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood," characterized in adults by avoiding friends, neglecting family, and inability to work. DSM-IV-TR 34 (American Psychiatric Association 2000).

On July 23, 2008, Dr. Gaertner opined that Plaintiff cycled through periods during which she was unable to leave her house or would have been so "distraught or distracted because of her feelings" that consistently going to work for eight hours a day, five days a week with any duties — interacting with people, processing information, assembling things or even observing things — would have been impossible for Plaintiff. (R. at 510-11.) Dr. Gaertner indicated that his notes, to the extent they are legible, may not support his finding and that he did not feel the need to write down every detail. (R. at 511.)

On November 24, 2009, Plaintiff demonstrated worsening depression, but no hypomania. (R. at 556.) During Plaintiff's January 18, 2010 visit, Dr. Gaertner noted that Plaintiff demonstrated a mildly depressed affect. (R. at 555.) Dr. Gaertner noted Plaintiff's mood stability and that she was doing "quite well" with the medication management on May 17, 2010. (R. at 554.)

Dr. Gaertner completed another mental impairment questionnaire and another mental residual functional capacity assessment for Plaintiff on December 9, 2010. (R. at 548-52.) Dr. Gaertner opined that Plaintiff had no difficulty or slight difficulty in her abilities to: (1) remember locations and work-like procedures, (2) understand and remember short and simple repetitive instructions or tasks, (3) carry out short and simple repetitive instructions or tasks, (4) carry out detailed instructions which may or may not be repetitive, (5) be aware of normal hazards and take necessary precautions, and (6) travel in unfamiliar settings and use public transportation. (R. at 550-51.) He assessed that Plaintiff experienced moderate difficulty in her abilities to: (1) understand and remember detailed instructions which may or may not be repetitive, (2) maintain attention and concentration for at least two straight hours with at least four such sessions in a workday, (3) sustain ordinary routine without special supervision, (4)

make simple work-related decisions, (5) complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rests, (6) request assistance from supervisors, (7) maintain socially appropriate behavior, (8) adhere to basic standards of neatness and cleanliness, and (9) set realistic goals or make plans independently. (R. at 550-51.) Plaintiff had moderately severe difficulties in her abilities to: (1) work in coordination with or proximity to others without being distracted, (2) interact appropriately with the general public or customers, (3) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and (4) respond appropriately to expected or unexpected changes in the work setting. (R. at 550-51.) Dr. Gaertner noted that Plaintiff's level of impairment was likely increased by attendance requirements and the need to make accurate or quick and accurate, independent decisions for problem-solving on a consistent basis. (R. at 551.) Additionally, Dr. Gaertner indicated that he considered Plaintiff to be "the type of person where a routine, repetitive, simple, entry-level job would actually serve as a stressor which would exacerbate psychological symptoms rather than mitigate stress in the workplace" and that Plaintiff had a medically/psychologically determinable impairment which could reasonably be expected to produce the symptoms which she described. (R. at 551.)

Plaintiff's symptoms included poor memory, emotional liability, loss of intellectual ability of fifteen IQ points or more, anhedonia or pervasive loss of interests, psychomotor agitation or retardation and difficulty thinking or concentrating. (R. at 548.) Dr. Gaertner recorded Plaintiff's GAF score at the time as 55, her highest GAF score for the past year as 60 and the lowest as 40. (R. at 548.) According to Dr. Gaertner, Plaintiff's mental impairments caused moderate and marked restriction of activities of daily, moderate difficulties in

maintaining social relationships, marked difficulties in maintaining concentration, persistence or pace with three episodes of decompensation. (R. at 549.) He also noted that Plaintiff was not a malingerer and could manage benefits in her own best interest. (R. at 549.)

      ii.    Dr. Steven Mussey, M.D.

On August 17, 2006, Dr. Steven Mussey, one of Plaintiff's primary care physicians, wrote that Plaintiff was "having a meltdown." (R. at 396.) During Plaintiff's following appointment on January 9, 2007, Dr. Mussey wrote that her bipolar disorder had been difficult to manage for the past decade that he knew her. (R. at 366.) Dr. Mussey also noted that Plaintiff was totally disabled in her profession due to the loss of her security clearance because of her illness. (R. at 367). In addition, he assessed that she was competent, coherent, appropriate and not suicidal/homicidal. (R. at 367.) On November 14, 2008, November 2, 2009, March 29, 2010 and May 13, 2010, Dr. Mussey observed that Plaintiff looked well and appeared comfortable. (R. at 531, 533, 536, 545.) On October 20, 2010, Dr. Mussey indicated that Plaintiff did not demonstrate depression or mania. (R. at 528.)

      iii.    Dr. Robi Tomargo, Psy.D.

On November 26, 2007, Dr. Robi Tomargo, Psy.D., noted that Plaintiff was too depressed to get out of bed and that she was very seriously mentally ill. (R. at 517.) Plaintiff indicated on June 3, 2008, that she was doing better than she had been in the winter, that she was not as depressed and that she took care of her son. (R. at 514-15.) Plaintiff also revealed that she was living in clutter. (R. at 516.) Plaintiff next visited Dr. Tomargo on July 1, 2008, when Dr. Tomargo observed that Plaintiff's hands were shaking. (R. at 513.) During Plaintiff's July 30, 2008 counseling session, Dr. Tomargo wrote that Plaintiff handled the stress of the hearing

reasonably well and that Plaintiff was not keeping up with the housework and was feeling more depressed. (R. at 520.)

C. Non-treating physicians

Dr. Dana Blackmer, Ph.D., a licensed clinical psychologist, assessed Plaintiff's conditions at the state agency's request. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 9.) On April 23, 2007, Dr. Blackmer opined that Plaintiff's concentration and attention, her short and long-term memory, her abstract reasoning, her social common sense reasoning and judgment were all good and that she had above average intelligence. (R. at 474-76.) Plaintiff was oriented, her thought process was logical and rational, and she showed no signs of psychosis or thought disorder. (R. at 475.) Dr. Blackmer determined that Plaintiff would have no difficulty with simple and repetitive tasks or detailed and complex tasks as well as accepting supervision, although she would have mild to moderate difficulty with accepting supervision during a mood episode. (R. at 476.) Dr. Blackmer assessed that Plaintiff had mild to moderate difficulty with dealing with co-workers and the public at times, completing a normal work day, working consistently over time and the usual stress in a competitive work place. (R. at 476.)

Dr. Sandra Francis, Psy.D., completed a residual functional capacity assessment for Plaintiff on May 15, 2007, and found that Plaintiff was not significantly limited in her abilities to: (1) remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, (2) sustain an ordinary routine without special supervision, (3) make simple work-related decisions, (4) request assistance, (5) accept instructions and respond appropriately to criticism from supervisors, (6) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness,

(7) be aware of normal hazards and take appropriate precautions, (8) travel in unfamiliar places or use public transportation, and (9) set realistic goals or make plans independently of others. (R. at 480-81.) Dr. Francis also opined that Plaintiff was moderately limited in her abilities to: (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, (5) work in coordination with or proximity to others without being distracted by them, (6) complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (7) interact appropriately with the general public, (8) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and (9) respond appropriately to changes in the work setting. (R. at 480-81.) Dr. Francis indicated that Plaintiff did not suffer marked limitations in any category. (R. at 480-81.) Dr. Francis noted that Plaintiff showed some limitation in dealing with work stressors and public contact and that Plaintiff said that she had difficulty concentrating. (R. at 482.) Dr. Francis found Plaintiff to be credible. (R. at 482.)

When rating Plaintiff's functional limitations, Dr. Francis discerned that Plaintiff had no limitation that restricted her activities of daily living, that she had mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and that Plaintiff had one or two repeated episodes of decompensation, each of extended duration. (R. at 495.)

D. Plaintiff's testimony

On July 25, 2008, Plaintiff appeared for a hearing in front of the ALJ, represented by her attorney. (R. at 30-66.) Plaintiff testified that, in an average week, she drove her car three or

four times to the grocery store, to a restaurant or to take her son to daycare. (R. at 39.) She also testified that she drove to Tennessee to see her family when her husband was out of town. (R. at 39.)

Plaintiff felt that she could not work, because she experienced inconsistencies in her condition day to day. (R. at 41.) Plaintiff also noted that she had no physical conditions that limited her ability to work that were not a side effect of her medications. (R. at 42.) Plaintiff could handle her banking, although her access to funds was limited. (R. at 43.) On a good day, Plaintiff laundered her clothes and washed dishes. (R. at 43.) On a bad day, Plaintiff would "get up and just be kind of unmotivated." (R. at 43.) Plaintiff estimated that in the thirty days before the hearing, she experienced twenty bad days, during which she eventually got out of bed, but sometimes not until three or four o'clock in the afternoon or, if it was earlier, she took an afternoon nap. (R. at 59-60.)

Plaintiff drove to Tennessee to stay with her mother on a monthly basis when her husband was away. (R. at 44-45.) Plaintiff performed most of the household shopping, some of the cooking and some of the cleaning. (R. at 45.) Plaintiff's hobbies included sewing, knitting, soap making and collecting Barbie Dolls. (R. at 46.) She maintained a craft room for her hobbies, which was so full that she had trouble opening the door. (R. at 58.)

Plaintiff was the primary caretaker for her cat and dog. (R. at 46.) Although Plaintiff said she did not have a set routine, she regularly went to a restaurant near her house when she wanted to be around people. (R. at 47.) Plaintiff needed no help with her personal care. (R. at 47-48.)

Plaintiff experienced tremors, poor balance, vision problems when doctors changed her medication and an upset stomach as side effects of her bipolar medication. (R. at 48, 54.) She

could write with a pen or pencil. (R. at 49.) Plaintiff experienced no psychiatric hospitalizations since her alleged onset date of December 6, 2006, but was hospitalized in November 2006 and one other time before. (R. at 50.) Plaintiff testified that she took her medications as directed and she felt that her medication helped her. (R. at 50-51.) She said "I feel that without [my medication], I would've probably committed suicide long ago." (R. at 50.) Plaintiff testified that her counseling sessions with Dr. Tomargo helped her. (R. at 52.)

Plaintiff had no problem being around people she knew, but if she felt like she did not belong, she "[got] nervous and kind of [felt] like hiding." (R. at 53.) Plaintiff claimed that she experienced short-term memory trouble, which manifested itself when she cooked dinner, as demonstrated by her need to set timers instead of timing things in her mind like she did before her condition. (R. at 54-55.) Plaintiff suffered problems with concentrating. (R. at 55.) She watched television most days, but could not usually watch a movie from beginning to end or watch sporting events. (R. at 55.)

Plaintiff maintained credit cards with low limits so that she would not run them up so high that she could not pay them. (R. at 57.) She maxed out one of her credit cards at $13,000, which she spent on craft materials, gas and food; she noted that about 75% of the spending was on items that she obsessed over. (R. at 57.)

Plaintiff contended that her bipolar disorder cycled rapidly from depressed to manic; however, she said that if she was tired, stressed or sick, her bipolar disorder became more difficult to handle. (R. at 62-63.) She said that her stressors included short-term stress, such as having trouble getting things done, and long-term stress, such as family problems. (R. at 63.) She was also stressed about the messy state of her home and the embarrassment that it caused. (R. at 64.)

On December 13, 2010, Plaintiff appeared for a second hearing after the Appeals Council remanded her case. (R. at 69.) Plaintiff indicated that she had not worked, applied for work or performed volunteer work since the first hearing in July 2008. (R. at 71-72.) She testified that about twelve days per month she had "depressed, bad days" when she would go back to bed after her husband and son left for the day. (R. at 73.) Plaintiff went to Tennessee to see her mother, where she rested on the couch. (R. at 75-76.) On a "good day" in March 2007, she "got up and . . . had some energy and . . . could concentrate and . . . wasn't either throwing up from the medicine or really shaking so bad[ly] that [Plaintiff] couldn't do coordinated things." (R. at 77.) She did laundry on a "good day" in March 2007, but it was an effort for her to take the laundry upstairs, because she lacked energy due to depression and medication side effects. (R. at 77-78.) Plaintiff explained that she laundered her clothes more often now, but still struggled bringing it upstairs. (R. at 78.)

Plaintiff said that many surfaces were covered in magazines or mail and she had difficulty keeping up with the housework. (R. at 79.) She got into trouble for bringing her son to school late too many times, which attributed to her son not wanting to go to school and Plaintiff having trouble getting motivated in the mornings. (R. at 82.)

Plaintiff described a recent mood swing and said that she started out feeling sad and then became irritable and difficult to be around, and then later she wanted to be left alone. (R. at 82-84.) During other mood swings, her mood went in different directions — from a "low" mood to a "high" mood in as little as fifteen minutes. (R. at 84-85.) She estimated that on four or five days each month she was "all over the map" with her mood and that most days she went through many mood swings. (R. at 85.) She also noted that she was more down in the winter and more up in the summer. (R. at 85.)

E.  Plaintiff's Function Report

Plaintiff completed a function report on March 11, 2007, in which she indicated that she got her son ready in the morning, cleaned her house and had dinner on a good day.  (R. at 236.) On "depressed bad days," she would go back to bed after her husband and son left. (R. at 236.) She fed and watered her pets.  (R. at 237.)  Her condition affected her ability to sleep, because when she was manic, she had to take sleeping medicine, and when she was depressed, she slept a lot.  (R. at 237.)  Plaintiff had no problems with her personal care.  (R. at 237.)  She prepared meals daily, which took her about five minutes to an hour to complete.  (R. at 238.)  Plaintiff's cooking habits changed since the onset of her condition in that she had to set timers, use recipes more frequently and cook simpler meals.  (R. at 238.)  Regarding house and yard work, Plaintiff cleaned, cooked, did laundry, mended clothes and swept the porch and deck.  (R. at 238.)  These activities took her minutes or hours.  (R. at 238.)  She needed reminders to complete these activities.  (R. at 238.)

Plaintiff went outside most days and walked, drove a car or rode in a car to travel.  (R. at 239.)  She maintained the ability to go out alone.  (R. at 239.)  Plaintiff could not always drive, because her medication sometimes caused blurred vision or dizziness.  (R. at 239.)  She shopped for clothes, books and groceries in stores and online for a couple of hours weekly, usually with her family.  (R. at 239.)  Plaintiff could pay bills, count change, handle a savings account and use a checkbook/money orders.  (R. at 239.)

Plaintiff listed sewing, reading, knitting and soap making as her hobbies and she read on most days.  (R. at 240.)  When describing the changes in those activities since the onset of her condition, Plaintiff reported that she shook more and sometimes she could not see well.  (R. at 240.)  She also noted that she spent time talking to others daily, either in person or on the phone.

(R. at 240.) Plaintiff said that she went to the grocery store, Costco, doctors' offices, a local restaurant near her house and the bank multiple times per week; she indicated that she did not need to be reminded to go places and did not need someone to accompany her. (R. at 240.) Plaintiff noted that she had trouble getting along with others when she was moody. (R. at 241.)

Plaintiff indicated that her abilities to stand and walk were affected by dizziness and that her abilities to see, use her hands and her memory were affected by some medications. (R. at 241.) Her condition also affected her ability to talk, complete tasks, concentrate and get along with others. (R. at 241.) She could pay attention for about ten minutes and could not finish what she started. (R. at 241.) Plaintiff followed written instructions "pretty well" and spoken instructions "not very well," noting that she needed to write notes down for spoken instructions. (R. at 241.) She generally got along well with authority figures. (R. at 242.)

Plaintiff did not handle stress well and she got very nervous. (R. at 242.) Under extreme stress, Plaintiff would go into a fugue state. (R. at 242.) She found that change could be somewhat stressful depending on the type of change. (R. at 242.)

F.  Activities of Daily Living

On December 12, 2007, Plaintiff completed a daily activities questionnaire in which she indicated that she washed dishes two to four times per week, made the bed less than weekly, did laundry two to four times per week, dusted and mopped less than weekly, swept and vacuumed weekly and that all of these activities were completed with help. (R. at 257.) Plaintiff gardened and went grocery shopping less than weekly with help and went out to eat two to four times per week without help. (R. at 258.) Plaintiff cooked for herself two to four times per week with help. (R. at 258.) Plaintiff took care of her personal needs without assistance and watched television for an average of thirty minutes per day. (R. at 258.) She drove 500-600 miles per

month on average and had no problems using public transportation. (R. at 259.) Plaintiff visited with friends weekly, where they talked, ate, shopped and watched the kids play. (R. at 259.) She slept for seven hours each night and took a two-hour nap during the day. (R. at 259.)

Regarding work on her daily activities questionnaire, Plaintiff was late to work a third of the time and needed breaks to regain her ability to focus or sometimes calm down. (R. at 260.) However, she could maintain her work routine, which was set at three days per week for seven hours per day. (R. at 260.) She could not concentrate on her work for extended periods of time, her productivity was down and she experienced difficulty completing her assigned work because of her inability to concentrate and a lack of energy. (R. at 260.) She could accept changes at work, but experienced difficulty and anxiety. (R. at 260.) Plaintiff had difficulty keeping up with her housework, and was often tired and depressed. (R. at 261.) On August 17, 2007, Plaintiff's appealing disability report indicated that her condition impacted her ability to care for her personal needs, because she needed to do everything at a slower pace, and going out to get things was difficult and required assistance or someone to go get it for her. (R. at 254.)

G. Third Party Function Reports

In an undated letter, Plaintiff's mother wrote that Plaintiff experienced difficulty getting up in the morning and could not clean her house. (R. at 277.) Plaintiff's mother claimed that Plaintiff was not like her old self and that Plaintiff's energy was gone. (R. at 278.) In a second letter dated December 9, 2010, Plaintiff's mother indicated that Plaintiff had no control over her ability to care for her home and self. (R. at 299.)

On March 8, 2007, Plaintiff's husband filed a third party function report. (R. at 225-35.) He said that Plaintiff's daily activities included taking care of their son and "business of the day," such as chores, errands, paying bills, hobbies and chatting with friends. (R. at 225-26.) He

said that he and Plaintiff took care of their son and two pets together and that Plaintiff took care of daily needs when he was traveling for work. (R. at 226.) He said that her bipolar disorder affected her emotional stability and that she sometimes had difficulty waking up, getting up and/or falling asleep. (R. at 227.) However, Plaintiff had no problems with her personal care and did not need reminders about personal care or medication. (R. at 227-28.) Plaintiff prepared complete meals for the family on a regular basis. (R. at 228.) Plaintiff performed housework, including cleaning, laundry, gardening, ironing and sewing. (R. at 228.) The household activities took varying amounts of time depending on Plaintiff's depression and Plaintiff needed encouragement to complete those chores when she was depressed. (R. at 229.)

Plaintiff's husband reported that Plaintiff went outside on a daily/weekly basis by driving or riding in a car, walking and using public transportation, depending on her depression and the weather. (R. at 229.) Plaintiff went out alone and could drive. (R. at 229.) He said that Plaintiff shopped weekly in stores and online for food, clothes, sewing materials and jewelry-making materials and that this shopping took her a normal amount of time. (R. at 230.) Plaintiff could pay bills, count change, handle a savings account and use a checkbook/money orders. (R. at 230.) He noted that Plaintiff's ability to handle money had changed since the onset of her condition, because "at times, she battle[d] obsessiveness for buying things." (R. at 230.)

Plaintiff regularly took part in her hobbies, which included reading, watching television, sewing, jewelry-making, camping and gardening. (R. at 230.) Plaintiff's husband noted that some medications impacted her sight, which made sewing and jewelry-making difficult. (R. at 230.) Plaintiff spent time with others chatting, sewing or making crafts on a weekly basis; she went out to dinner on a weekly basis and she did not need to be reminded to go places. (R. at

231.) He noted that Plaintiff's only trouble getting along with family was that she did not get along with her father-in-law, which was not attributable to her illness. (R. at 231.)

When asked to identify which items Plaintiff's condition affected, Plaintiff's husband said that the bipolar disorder impacted her concentration and memory and that the medication impacted her sight and ability to use her hands. (R. at 232.) Plaintiff finished what she started, had no problems following written or spoken instructions and got along with authority figures. (R. at 232.) Plaintiff's ability to handle stress varied with her medication and depression. (R. at 233.) She handled some changes well, but found others difficult. (R. at 233.) He noticed no unusual behavior or fears in Plaintiff. (R. at 233.)

On June 19, 2008, Plaintiff's friend and former co-worker, Shirley Fishback, wrote a letter describing that Plaintiff had trouble with concentration and motor skills, such as holding eating utensils. (R. at 279-80.) Ms. Fishback witnessed Plaintiff shaking and losing her train of thought in the middle of a sentence. (R. at 281.) The letter indicated that, "[Plaintiff was] not the type of person who wants to be a burden or [sic] someone who cannot take care of herself. But the [Plaintiff] I have known for many years [was] not capable of working." (R. at 281.)

In a letter dated July 24, 2008, Plaintiff's husband wrote that Plaintiff's bipolar disorder caused Plaintiff to experience a loss of focus, which negatively impacted her organization, and a loss of motivation, which negatively impacted keeping her home clean. (R. at 282.) He also noted that Plaintiff experienced side effects from her medications, such as an upset stomach, weight fluctuation and trouble sleeping. (R. at 282.) Plaintiff had shaky hands, which frustrated Plaintiff when she was crafting. (R. at 282.) Plaintiff became obsessive when she was in a manic state and could not stop working on her hobbies, such as her Barbie Doll collection,

sewing, gardening, knitting and making soap. (R. at 283.) He also noted that Plaintiff reacted

negatively to change or confrontation. (R. at 283.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed her current application for DIB on December 27, 2006 (R. at

175), claiming disability due to bipolar disorder. (R. at 209.) The Social Security

Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[4] (R. at 98.)

On July 25, 2008, accompanied by counsel, Plaintiff testified before an ALJ. (R. at 98.) On

August 27, 2008, and again on January 19, 2011, the ALJ denied Plaintiff's application, finding

that she was not disabled under the Act, because based on her age, education, work experience

and residual functional capacity, there were jobs that she could perform which existed in

significant numbers in the national economy. (R. at 28-29, 106-07.) The Appeals Council

subsequently denied Plaintiff's request for review, making the ALJ's decision the final decision

of the Commissioner subject to judicial review by this Court. (R. at 1.)

## III. QUESTION PRESENTED

A. Does substantial evidence on the record exist to support the ALJ's decision that
   Plaintiff's treating physician's opinions are entitled to little weight?

B. Does substantial evidence on the record exist to support the ALJ's decision that
   Plaintiff's statements concerning her symptoms are not credible?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to

determining whether the Commissioner's decision was supported by substantial evidence on the

---

[4] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted). To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477 (citation omitted). If the ALJ's determination is not supported by substantial evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The analysis is conducted for the Commissioner by the ALJ and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[5] based on an assessment of the claimant's RFC and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from past

---

⁵     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock,* 667 F.3d at 472-73; *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146, n.5). The Commissioner can carry his burden in the final step with the testimony of a Vocational Expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

A. The ALJ's Analysis

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of her disability. (R. at 17.) At steps two and three, the ALJ found that Plaintiff had the severe impairment of an affective disorder, but that this impairment did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for the award of benefits at that stage. (R. at 18-20.) The ALJ next determined that Plaintiff had the RFC to perform a full range of

work at all exertional levels, but was limited to simple, unskilled work with only occasional contact with the general public. (R. at 20.)

The ALJ then determined at step four of the analysis that Plaintiff could not perform her past relevant work as a systems engineer. (R. at 41.) At step five, after considering Plaintiff's age, education, work experience and RFC, and after consulting a VE, the ALJ found that occupations existed in significant numbers in the national economy that Plaintiff could perform. (R. at 28.) Specifically, the ALJ found that Plaintiff, regardless of her limitations, could work as a general laborer, institutional cleaner, janitor/industrial cleaner, kitchen helper, cleaner/housekeeping and assembler of small products. (R. at 28-29.) Accordingly, the ALJ concluded that Plaintiff was not disabled and therefore she was not entitled to benefits. (R. at 29.)

Plaintiff moves for a finding that she is entitled to benefits as a matter of law, or in the alternative, she seeks reversal and remand for additional administrative proceedings. (Pl.'s Mot. in Supp. of Summ. J. ("Pl.'s Mem.") at 30.) In support of her position, Plaintiff argues that the ALJ improperly afforded Plaintiff's treating physician's opinion less than controlling weight and that the ALJ improperly assessed Plaintiff's credibility. (Pl.'s Mem. at 12.) Defendant responds that the ALJ's decision is supported by substantial evidence and application of the correct legal standard such that it should be affirmed. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 26.)

B. The ALJ did not err in affording less than controlling weight to Dr. Gaertner's opinion.

Plaintiff contends that the ALJ erred in affording Plaintiff's treating physician's opinion less than controlling weight, arguing that the ALJ's determination that Dr. Gaertner's opinion was inconsistent with the record is broad and unexplained, speculative and based on evidence

taken out of context. (Pl.'s Mem. at 14-15, 17, 20-21.) Defendant contends that the ALJ articulated six sound reasons as to why Dr. Gaertner's opinion was given little weight and that substantial evidence in the record supports the ALJ's determination. (Def.'s Mem. at 16-20.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. 20 C.F.R. § 404.1527(d)(3)-(4), (e);

*Jarrells v. Barnhart*, No. 7:04cv411, 2005 U.S. Dist. LEXIS 7459, at *9-10 (W.D. Va. Apr. 26, 2005).

The ALJ afforded Dr. Gaertner's opinion little weight on the basis that the three opinions Dr. Gaertner offered contradict each other and are inconsistent with the treatment notes and the record as a whole. (R. at 24.) Indeed, the ALJ provided rationale for not assigning the opinions controlling weight. The ALJ noted that Dr. Gaertner issued three opinions which contain inconsistencies within themselves, with each other, with the medical records and the record as a whole. (R. at 24.) The ALJ gave limited weight to the August 11, 2007 opinion, because it was inconsistent with the medical record and was also internally inconsistent. (R. at 25.) He afforded little weight to the July 23, 2008 opinion, because the opinion was unsupported by the doctor's treatment notes and the record as a whole. (R. at 24.) Dr. Gaertner's December 9, 2010 opinion held little weight, because it was inconsistent with the record as a whole, it was internally inconsistent and it was not supported by the medical record. (R. at 25.) Such determination by the ALJ is supported by substantial evidence.

     i.    August 11, 2007 Opinion

In his August 11, 2007 opinion, Dr. Gaertner assessed that Plaintiff experienced moderately severe difficulty in her abilities to carry out detailed instructions which may or may not be repetitive, to maintain attention and concentration for at least two straight hours with at least four such sessions in a work day, to complete a normal work day and work week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rests. (R. at 500-01.) Plaintiff had no severe difficulty with any activities, a mild restriction on daily activities, moderate difficulties in maintaining

social relationships and marked difficulties in maintaining concentration, persistence or pace. (R. at 500-03.)

However, that opinion is not consistent with Dr. Gaertner's treatment notes. The notes from the initial assessment that Plaintiff underwent at Dr. Gaertner's office on November 15, 2006 — the most recent notes on record before the August 11, 2007 opinion — indicated that Plaintiff had good memory and intact attention and concentration. (R. at 338.) Previous notes indicate that Plaintiff experienced anxiety on November 9, 2006 (R. at 335), depression on June 28, 2006 (R. at 341), and mild sleep disturbance on January 10, 2005 and October 19, 2004 (R. at 346-47), but demonstrated mood stability on August 22, 2006 (R. at 340), January 3, 2006 (R. at 336), September 20, 2005 (R. at 343), April 12, 2005 (R. at 345), January 10, 2005 (R. at 346), October 19, 2004 (R. at 347), August 17, 2004 (R. at 348) ,and April 6, 2004 (R. at 350), and showed no evidence of anxiety on October 12, 2006 (R. at 339). Plaintiff had good memory and intact attention and concentration. (R. at 338.) Other than the initial assessment from November 15, 2006, Dr. Gaertner failed to provide any details in his treatment notes about Plaintiff's alleged difficulties in those areas.

Also in the August 11, 2007 opinion, Dr. Gaertner noted that Plaintiff had four or more episodes of decompensation. (R. at 502-03.) However, Plaintiff's testimony indicated that Plaintiff only had two episodes of decompensation. (R. at 50.) Plaintiff had no psychiatric hospitalizations since her onset date of December 6, 2006. (R. at 50.) Plaintiff was hospitalized in November 2006 and one other time prior, but had not been hospitalized or had any additional fugue states since November 2006. (R. at 50.)

Dr. Gaertner's August 11, 2007 opinion is also inconsistent with the record as a whole. Plaintiff's husband's third party function report from March 8, 2007, revealed that Plaintiff took

care of her son on a daily basis. (R. at 226.) Plaintiff's husband also indicated that Plaintiff regularly participated in her hobbies of reading, watching television, sewing, jewelry-making, camping and gardening. (R. at 230.) He also revealed that Plaintiff spent time chatting with others, sewing and crafting, and went out to dinner weekly. (R. at 231.) Plaintiff herself listed several hobbies on her March 11, 2007 function report, including sewing, reading, knitting and soap making. (R. at 240.)

        ii.     July 23, 2008 Opinion

On July 23, 2008, Dr. Gaertner opined that Plaintiff could not work 40 hours per week with any duties — interacting with people, processing information, assembling things or even observing things — because of her bipolar disorder. (R. at 510-11.) The medical records for the relevant time period are illegible (R. at 505-09), but this opinion is inconsistent with the record as a whole. In this assessment, Dr. Gaertner opined that Plaintiff could not carry on consistently with any duties. (R. at 510-11.) However, Plaintiff testified during her July 25, 2008 hearing that she could handle her banking, launder her clothes, wash her dishes, partake in her hobbies, care for her pets, shop, cook, clean and drive to visit her mother in Tennessee. (R. at 43-46.) She also watched television most days. (R. at 55.) Her December 12, 2007 daily activities questionnaire also indicated that Plaintiff could clean, shop, go out to eat, cook, take care of her personal needs, watch television for 30 minutes each day, drive 500-600 miles per month and visit with her friends. (R. at 257-59.) When she was visiting with her friends, they talked, ate, shopped and watched the kids play. (R. at 259.) Again, Plaintiff's husband's third party function report confirmed that Plaintiff took care of her son on a daily basis, went out to dinner, read, watched television, sewed, made jewelry, camped, gardened and spent time with friends

chatting, sewing and crafting. (R. at 226, 230-31.) As mentioned, Plaintiff listed several hobbies on her function report, including sewing, reading, knitting and soap making. (R. at 240.)

      iii.     December 9, 2010 Opinion

In Dr. Gaertner's mental residual functional capacity assessment from December 9, 2010, he opined that Plaintiff had no difficulty or slight difficulty in her abilities to: (1) remember locations and work-like procedures, (2) understand and remember short and simple repetitive instructions or tasks, (3) carry out short and simple repetitive instructions or tasks, (4) carry out detailed instructions which may or may not be repetitive, (5) be aware of normal hazards and take necessary precautions, and (6) travel in unfamiliar settings and use public transportation. (R. at 550-51.) He assessed that Plaintiff experienced moderate difficulty in her abilities to: (1) understand and remember detailed instructions which may or may not be repetitive, (2) maintain attention and concentration for at least two straight hours with at least four such sessions in a workday, (3) sustain ordinary routine without special supervision, (4) make simple work-related decisions, (5) complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rests, (6) request assistance from supervisors (7) maintain socially appropriate behavior, (8) adhere to basic standards of neatness and cleanliness, and (9) set realistic goals or make plans independently. (R. at 550-51.) Plaintiff had moderately severe difficulties in her abilities to: (1) work in coordination with or proximity to others without being distracted, (2) interact appropriately with the general public or customers, (3) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and (4) respond appropriately to expected or unexpected changes in the work setting. (R. at 550-51.) Dr. Gaertner noted that Plaintiff's level of impairment was likely increased by attendance

28

requirements and the need to make accurate or quick and accurate, independent decisions for problem-solving on a consistent basis. (R. at 551.) Additionally, Dr. Gaertner indicated that he considered Plaintiff to be "the type of person where a routine, repetitive, simple, entry-level job would actually serve as a stressor which would exacerbate psychological symptoms rather than mitigate stress in the workplace" and that Plaintiff had a medically/psychologically determinable impairment which could reasonably be expected to produce the symptoms which she described. (R. at 551.)

Dr. Gaertner's mental impairment questionnaire from December 9, 2010 indicated that Plaintiff's signs and symptoms included poor memory, emotional liability, loss of intellectual ability of fifteen IQ points or more, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, and difficulty thinking or concentrating. (R. at 548.) He noted that her current GAF score as 55, her highest GAF score for the past year as 60 and the lowest as 40. (R. at 548.) Dr. Gaertner opined that Plaintiff's restriction of activities of daily living as a result of her mental impairments was moderate and marked, her difficulties in maintaining social relationships were moderate, her difficulties in maintaining concentration, persistence or pace were marked and that she had three episodes of decompensation. (R. at 549.) He also noted that Plaintiff was not a malingerer and could manage benefits in her own best interest. (R. at 549.)

This December 9, 2010 opinion is inconsistent with Plaintiff's treatment notes. On November 24, 2009, Dr. Gaertner recorded that Plaintiff demonstrated worsening depression, but no hypomania. (R. at 556.) During Plaintiff's January 18, 2010 visit, Dr. Gaertner observed that Plaintiff demonstrated a mildly depressed affect. (R. at 555.) Dr. Gaertner noted Plaintiff's mood stability and determined that she was doing "quite well" with the medication management on May 17, 2010. (R. at 554.)

Dr. Gaertner's December 9, 2010 opinion is inconsistent with the record as a whole. In a letter dated May 11, 2007, Dr. Blackmer assessed that Plaintiff had no difficulty performing simple and repetitive tasks or detailed and complex tasks, and she would have no difficulty accepting supervision, except she may have difficulty during a mood episode. (R. at 474, 476.) Dr. Gaertner opined that Plaintiff would only have mild to moderate difficulty with dealing with co-workers and the public, completing a normal workday and working consistently over time with usual workplace stressors. (R. at 476.)

Plaintiff's testimony is also inconsistent with the December 9, 2010 opinion. On July 25, 2008, Plaintiff testified that she drove to Tennessee to see her family, handled banking, did most of the shopping, cooking and cleaning, and engaged in several hobbies. (R. at 39, 43, 45-46.) She took care of her pets and needed no help with her personal care. (R. at 46-48.) She said in her daily activities questionnaire that she drove 500-600 miles each month and had no problem with public transportation. (R. at 259.) She interacted with her friends on a weekly basis and she wrote that she was able to maintain her work routine of three days per week at seven hours per day. (R. at 259-60.) In her function report, Plaintiff said she could follow written instructions "pretty well." (R. at 241.) Plaintiff's husband said that she finished what she started, had no problems following written or spoken instructions and had no issues getting along with authority figures. (R. at 232.)

Because substantial evidence supports the ALJ's determination that Dr. Gaertner's opinions are inconsistent with his own treatment notes and the record as a whole, the ALJ did not err in affording Dr. Gaertner's opinions less than controlling weight.

C. The ALJ did not err in assessing Plaintiff's credibility.

Plaintiff argues that the ALJ's decision erred in assessing Plaintiff's credibility, because her credibility is intertwined with the treating physician's opinions, which were given little or limited weight and, therefore, negatively impacted the ALJ's assessment of her credibility. (Pl.'s Mem. at 17.) Defendant responds that substantial evidence supports the ALJ's determination regarding Plaintiff's credibility, because Plaintiff's complaints were inconsistent with the medical evidence of record and her daily activities on the record. (Def.'s Mem. at 25-26.) Additionally, Defendant maintains that the ALJ credited Plaintiff's complaints to some extent by limiting her to unskilled work even though her last job was skilled work. (Def.'s Mem. at 26.)

Here, the ALJ determined that Plaintiff's impairment could reasonably be expected to cause some of the alleged symptoms, but that Plaintiff's statements about the intensity, persistence and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC assessment, which indicated that Plaintiff could perform a full range of work at all exertional levels, except that she was limited to simple, unskilled work with only occasional contact with the general public. (R. at 20-21.) The ALJ's determination regarding Plaintiff's credibility is supported by substantial evidence in the record, because her claims were inconsistent with her reported daily activities and with medical evidence.

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-

7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. *See Mickles v. Shalala*, 29 F.3d 918, 919

(4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Plaintiff claims that she cannot work, because her mental condition varies and fluctuates in an unpredictable manner. (Pl.'s Mem. at 15.) However, Plaintiff indicated that she was able to take care of herself and her son, care for her pets, drive, cook, go out, visit with family and friends, use public transportation with no problems, partake in hobbies, pay bills, shop and appropriately handle authority. (R. at 236-40, 242, 259.) Even Plaintiff's husband indicated that she could care for her son, take care of daily needs while her husband was away, do chores, run errands, pay bills, partake in hobbies, chat with friends, tend to her personal needs, cook complete meals, sew, garden, iron, clean, do laundry, drive, go out alone, use public transportation, shop, read, go out to dinner, walk a "normal" distance before needing to rest, finish what she started, follow instructions and get along with authority figures. (R. at 225-35.) There is no evidence in the medical record for treatment of the physical effects that Plaintiff alleged in her testimony, such as vision problems, balance problems and tremors. (R. at 48, 54.)

Additionally, Plaintiff retained many abilities, according to her several doctors. (R. at 474-76, 480-81, 500-03, 548-52.) On April 23, 2007, Dr. Blackmer opined that Plaintiff had good concentration and attention, good short and long-term memory, good abstract reasoning, good social common sense reasoning, good judgment and above average intelligence. (R. at 474-76.) Dr. Blackmer also assessed that Plaintiff would not have difficulty completing simple and repetitive tasks or detailed and complex tasks. (R. at 476.)

On May 15, 2007, Dr. Francis assessed that Plaintiff retained her ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to make simple work-related decisions, to request assistance, to accept instructions and respond appropriately to criticism from supervisors, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (R. at 481.) Dr. Francis found that Plaintiff suffered no marked limitations. (R. at 480-81.)

On August 11, 2007, Dr. Gaertner found that Plaintiff had no impairment or only slight impairment in her abilities to: (1) remember locations and work-like procedures, (2) understand and remember short and simple repetitive instructions or tasks, (3) request assistance from supervisors, (4) accept instructions and respond appropriately to criticism from supervisors, (5) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, (6) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, (7) be aware of normal hazards and take necessary precautions and to travel in unfamiliar settings and use public transportation. (R. at 500-01.) Dr. Gaertner found that Plaintiff suffered no severe limitations in any category. (R. at 500-01.) On December 9, 2010, Dr. Gaertner opined that Plaintiff had no impairment or only slight impairment in her abilities to: (1) remember locations and work-like procedures, (2) understand and remember short and simple repetitive instructions or tasks, (3) carry out short and simple repetitive instructions or tasks, (4) carry out detailed instructions which may or may not be repetitive, (5) be aware of normal hazards and take necessary precautions, and (7) travel in unfamiliar settings and use public

transportation. (R. at 550-51.) Again, Plaintiff experienced no severe limitations. (R. at 550-51.)

These facts are inconsistent with the severity of the symptoms that Plaintiff claimed to have. Therefore, substantial evidence supports the ALJ's assessment of Plaintiff's credibility.

## VI. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED; that Defendant's motion for summary judgment (ECF No. 9) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable John A. Gibney and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: July 2, 2013